Our second case this morning is number 19-1073, In Re Forney Industries, Inc. Mr. Cochran, all right. Go ahead. Well, good morning. Thank you for hearing this case. I would like to tell you that the issue in this case is very simple. We don't have any holograms involved in this case. The issue in this case is whether applicants mark presents a pattern, design, or shape that is distinctive. Inherently distinctive, right? Inherently distinctive, right? Even under your theory, it seems to me that the specimens of the mark don't correspond to the mark itself. You seem to be trying to get a mark which includes any shading from one color to another, as opposed to the specifics of the mark that was presented because of this inconsistency between the specimens and the mark. Well, the specimens are presented to the trademark office to show use of the mark in commerce. Right, but we need consistent use. You need the use to be consistent. No, not necessarily, because as long as we have specimens that do correspond to the mark, then those specimens are qualified as usage of the mark. We've got, certainly... But the specimens are suggesting that the mark doesn't require a fixed design. It suggests that the mark that's being sought is based, in fact, on the use of particular colors without specifying a fixed proportion of those colors in the design. No, what we're applying for is this mark. What we are asking for registration of is not marked. A30, right? That's your... Appendix 30. Right. And this is different from the pencil case, because we're seeking registration of this mark. I understand, but to follow up on Judge Dyke's question, if you just look at the specimen at A32, for example, I don't know if that's some circular saw blade or something like that, but with the packaging, the amount of red in that packaging is not the same as the amount of red, relatively speaking, in your A30 proposed mark. Well, these pictures are not... They can be decedents. And so the concern... That's the problem. The concern here... There's multiple concerns here, but one concern here is when your specimens show a variance in the scheme of your design to the point where whatever color pattern you're trying to get a registration on doesn't line up with the actual color scheme in your specimens. Right. Well, this was not an issue that was raised by the examiner. If they had a problem with the specimen... Well, there is, in the first footnote to the board decision, there is a reference to the specimen problem. Well, it should have been raised by the examiner, and we should have had an opportunity to submit specimens. They say if this got reversed that you'd have to submit new specimens, as I understand what they're saying. And we're glad to do that. We're glad to submit new specimens. That's footnote three, actually. Specimens that actually were in use at the time we filed this application. This has been used for... Obviously, the main event is really trying to understand the meaning of Qualitex, as well as Walmart, and maybe Tupesos as well. But if I can just keep going on this proposed mark, what we have here is this kind of abstraction of colors that are disembodied from any particular tangible thing. Is it your view that your mark is for any kind of packaging from this company, Pony Industries, regardless of shape or anything? Well, it's used on backup cards. It's used on labels. No, I'm trying to understand your conception of what is the scope of your application and what kind of protection you're seeking. Are you seeking anything and everything that will have this color scheme on it? Or are you being more specific about it in terms of it's just going to be on package backing cards? And maybe even more specifically than that, square or rectangular shaped package backing cards? Or is it, going back to my original question, everything and anything that you might be able to put this color scheme on? The description in the trademark application says that it's on backer cards or labels. And that's what we're seeking protection in this trademark application. Suppose, if you look at the design, it's on page two of the appendix. Suppose the black were twice as large as it is in that figure. Would that be covered by the mark? That's an issue for infringement. Well, there's a likelihood of confusion. There would be a likelihood of confusion. But it wouldn't be literally within the mark if the black were twice as big? No, it wouldn't be literally within the mark. That's the mark that's shown. We're applying for that mark that's shown on the appendix. And the visual depiction of the mark governs rather than the verbal description of it, right? Yes. But they both are important in actually what we're applying. I mean, you have to look at this in terms of the fact that... Well, what role does the verbal description play? Because the verbal description is really broad. It consists of colors red into yellow and a black banner located near the top. Correct. Well, that's an attempt to try to verbally describe what the mark is, which we're trying to get protection. Yeah, but it's a description that's incredibly broad and makes it sound as though any combination of colors like this, no matter what the proportionality is, would be covered by the mark, which I think would be problematic. That sounds like trying to trademark the colors as opposed to trademarking a particular design. That's a 43A common law issue that was raised in the 10th by the 10th circuit. We're not applying for the description. We're applying for what is shown in the drawing. And what's shown in the drawing is this particular set of colors. In the proportion that they're shown in the figure. Exactly. Is there anything in the 10th circuit, for any opinion that you disagree with? Or do you essentially agree with it? Because I think my understanding of part of your argument was, is that at least for purposes of this mark, as depicted in your trademark application, it fulfills whatever requirements the 10th circuit was contemplating in terms of a specific shape, pattern, or design. That is what we are arguing. So that's why I'm just trying to figure out, is there anything in the opinion, though, that you disagree with? Because obviously there they found that there was no inherently distinctive mark there. That case was deciding on the fact that there was not a precise verbal description of the mark. And the mark, as it was described, could cover a number of different things. And they said it was too amorphous. Right. Is there anything you disagree with in the 10th circuit opinion? Well, they say, well, the planche countered its distinctive design. But they don't say that this mark that we're dealing with now lacks a specific design. Yeah, that's correct. They did not say that. The restatement third of unfair competition is also clear. It says color can be protected as an element of the trademark when used as part of a design pattern or combination of colors. That as a whole, it's inherently distinctive. Which opinion is this that you just quoted? Restatement. That's the restatement of unfair competition. And I think we've fallen into that. This is a geometric design. It is a gradient that moves from red to yellow. What if your mark was just red and white, period? Half red, half white. Left-hand side is red, right-hand side is white. Would you say that that is a, I don't know, a specific concrete design shape or pattern that needs to now be evaluated under inherent distinctiveness? Well, you see, that's a judgment call. And that's why we're here. Well, I'm trying to get your views. I'm trying to get your thoughts on this. I'm trying to figure out how far you really want the law to go in demanding color marks to be considered under inherent distinctiveness. I think you have to look at it and you say, is this inherently distinctive? Okay, so in your view, something as simple as two colors like that, half white, half red, half white, half black. Now it's like, okay, trademark office, get to work, go figure out if that's inherently distinctive. No, I don't think it is. Okay, so then... Now, if you were to swirl those in a particular way, or if you were to create like they do on a copy and you have a particular design for those two colors, yes. I think that that could be inherently distinctive. Okay, do you want to save your bottle time here? Yes. Okay. Thank you. Ms. Walker? Good morning. Isn't a specific design that wouldn't be subject to trademark. I mean, I agree that there's a disconnect between the visual depiction here and the specimens. That's a problem because it might suggest that the mark goes beyond the specific depiction here. But why, you know, this is, this seems to be unusual, it seems to be distinctive with this proportionate black more than yellow and then shading into orange and if it's, it's done in this particular way, why isn't that subject to trademark? Yes, Your Honor, and I think that Judge Chen's example of the red and white combination is a good starting point for that, for that principle. Let's start with the actual design here. Well, so. I don't think the fact that this design would be subject to trademark means that the red and white necessarily would be subject to trademark. I don't think the point is that any depiction of more than one color in a design becomes inherently distinctive. But this, if you look at this one, this does look distinctive. Well, I think the question, though, is what is motivating the rationales in both Walmart and Holofax? And I was referring to the example that Judge Chen gave to then look at two specific examples in the record here for that motivation, the underlying motivation. So I think both APTX 36, which is an example of the use of the mark here as a specimen, shows sort of the black at the top and then something that consumers would perceive as nothing more than color, right? It's a gradient of color, but really when they're seeing it on the shelf, they're going to just see it as nothing more than two sets of color. What page is this in? This is 36, and this is one of the specimens that the board included in the petition. And then there's another example, which is sort of a zoomed out version of the same thing, which is that Appendix 70. And again, this is the, what, 20th, 19th week since 2007. What consumers are going to perceive is no different than this two sections. I think your argument seems to assume that we're trying to figure out right now whether this particular mark with these particular specimens could be considered inherently distinctive. But we have a more fundamental question that the board answered, which is that as a matter of law, there's no way that any proposed mark that's just relying on multiple colors could ever be subject to protection as inherently distinctive. And so that's really the question here. I mean, we could pick apart these specimens if we wanted to, but now the question is, why couldn't some very unique, unusual pattern of colors, where the colors are individually in different shapes and in all relation to each other, then create some kind of very unique standout design? Why couldn't that serve as indicating source? Just like any other unique, interesting, inherently distinctive trade dress. And I want to be clear that there's several different inquiries in the question that you just stated. There's a threshold question of can there be detachment, right? And so there's no question here that colors, whether a single color or multiple colors, can serve as a trade marker. I'm talking about inherent distinctiveness. But I just want to be clear that at that sort of threshold level, then there's a question of whether, as the board articulated here, that color marks, whether it's a single color or a combination of colors, are of a nature that could be inherently distinctive. But the board did articulate a test, a more simple test, than the Seabrook test, which would be the alternative, which is a question of whether the colors are a distinct pattern or design. So if there is a distinct pattern or design, and I understand Judge Dyke's question to go into that point, is there a distinct design here? Once you get to the point of is there a distinct design, then the next inquiry would be analysis under the Seabrook test. The board popularly didn't do that Seabrook analysis here because it looked at Walmart and Politech, and it found that this was the type of mark where that type of multi-factor analysis would be inappropriate. But there are... And as I understand the board's decision rationale, it included it's unnecessary to go to Seabrook because this is a multi-color mark. That's right. Because it found that it didn't include a distinct pattern. And so what I'm trying to understand from your point of view is can there ever be multiple colors, and only multiple colors, that can have a pattern or design? Well, I think there has to be a distinct element to it, and so certainly Latica is an example where... Why isn't this a distinct pattern where you have various colors and shades of colors in a particular proportion? Suppose this mark had been rotated 45 degrees. Would that be a specific design? Is the problem is that it starts with a bar of colors at the top and then works down? Suppose it were rotated 45 degrees? I'm not sure that that would make a difference. And I will say here, the board's analysis of whether this included a distinct pattern or design is on AQCX 7 through 9. And one of the things that the board was looking at was how can Walmart just repeat this? And the fact that this is located on a backer card, and we know that from Walmart's description, and it serves as a background carrier for other elements on the packaging, indicated to the board that this is of the nature that consumers aren't going to perceive it on day one. Whether other designs, or whether other color schemes might include a particular distinct design is a factual question that would be satisfied on a case-by-case basis. But the board will hear... I'm a little confused. Are you saying that maybe there could have been a different, more complex, more unusual color scheme other than the one that's provided at A30? That the board would have then found, oh, okay, what we have here is something that should be considered for inherent distinctiveness. Both the 10th Circuit and the board said that the analysis is whether there's a distinct pattern or not. And the board found here that there wasn't a distinct pattern. It wasn't clear to me if that was because it expected that the color scheme here had to be confined to a particular shape. Maybe like a diamond shape of this particular color scheme that's printed on the product packaging somewhere. Almost like a logo. And then in that sense, the board would feel comfortable with that. But otherwise, it would seem like this board decision rests on the premise that no color scheme, no matter how interesting or unusual, for package backing cards would be good enough. So the board's decision did not rest on the fact that there wasn't a distinct peripheral shape of the mark, right? But that would be a separate inquiry. And we know that, too, because the Patent and Trademark Office uses STFL in analyzing repeating pattern marks. So there's a separate analysis for repeating pattern marks. So if you are in a situation where you have a distinct pattern of design, that is a situation where it's not simply a color mark. So we're not projecting that any design, any distinct design, would necessarily fall into a multiple color pattern. This is not a distinct design because it's rectangular? Is that the idea? No, it's because there's not really – there's more than just defines clearly the nature of the combination of colors here. You have a gradient that goes from red to yellow. And that is not something that consumers would see as a distinct pattern. Rather, it's something, as I was explaining earlier, that really is akin to a single color. We've got black. We've got yellow. We've got red. And then we have a gradient between the yellow and red band that obviously moves from yellow to red. So it's kind of orangey and pixelated. So now we're dealing with three colors plus a gradient. So why can't that potentially be enough? Well, I guess the question is enough of what, right? I mean, what the board found – Enough to be considered a legitimate pattern or design such that now, like all other pattern or design trade dress marks that are applied for, you've got to evaluate it under inherent distinctiveness. Well, I mean, again, and all I can do is press the board position. The board considered that and found it didn't? Well, I mean, I'm looking at A10, and at the bottom of A10, it says, We find that a color mark consisting of multiple colors applied to product packaging is not capable of being inherently distinctive. So that feels pretty cut and dried that the agency has taken a position that anything that rests on multiple colors applied to product packaging is no good, regardless of how interesting, unique, unusual, striking the particular pattern or design of those colors may be. But again, it's about whether the design was distinctive, and the board was clear that it was defining what a multiple color mark was as one that didn't include a distinctive pattern for the product. Well, why isn't this a distinctive pattern or design? I mean, it has a particular proportion between the black at the top and then the other colored shades. What's not distinctive about that? Good. The impression that consumers get from this is one that is the same as a single color. And if this mark has a distinct color pattern or design, then it's hard to see why the red and white combinations also do it. Really, what you're saying is that there are no multiple color marks that wouldn't include a distinct pattern or design, because as soon as you put two colors together, you're necessarily going to have some type of design. And the question is whether there's a particular distinct pattern or design that's one that consumers would view as different from color. I guess even if I were to agree that the board somehow implicitly thought that there was a problem with the lack of a pattern or design here, it didn't ever actually articulate why, by walking through this particular picture, this particular depiction, why this is somehow too plain, ordinary, basic, common, whatever words you want to use, such that black, yellow, orange, gradient, red is no good for it, particularly in this order, in this particular proportion. I don't see any kind of analysis like that. What I see is a straightforward view that Qualitex tells us that color marks are no good, and this is a color mark, because it's got multiple colors. I might agree with you that there is variance between the depicted mark and then what is shown to us in the specimens, but that's a different question than whether color marks that have a particular design can ever be considered for inherent distinctiveness, and then just exactly where was the analysis from this board that would suggest that explaining why this particular proposed design is not really a sufficient design to even be considered under the Seabrook factors? If the question is whether or not the board sufficiently defined what is distinctive design or uniform design, that's something that this court could re-hand with instructions on what the definition of those terms are, or could re-hand for further explanation. I would caution again, though, that if this color scheme here is one that the court finds that the board didn't have substantial evidence to support its finding that there isn't a distinctive design here, it's hard to imagine what color scheme would fail. Okay, so hypothetically, if this mark had 15 colors and all kinds of stripes and squares and circles of colors, and you're saying, okay, that one would be good enough to be considered for inherent distinctiveness? That certainly seems like the type of example where we could find a distinctive pattern of design and then move on to the Seabrook analysis. And the problem is that it's bars in a rectangular design? Well, it's the gradient, I think, that there's not a defined definition here. It's something that consumers would see as something really other than a single color. Or color, right? Because the impression is color, but it's not of a design. So, just so I understand, the agency believes a mark with multiple colors could potentially be considered inherently distinctive and would need to be examined for inherent distinctiveness, just not this particular one. If the tessiteric board articulation is combined with a distinct pattern, then yes, that would be the type. Well, suppose it were circular instead of rectangular. Well, the question here, though, is when it's applied to a backer card. So, if it had a circular shape that was defined, then we're not talking about color, we're actually talking about shape. So, here what we're talking about is something that's applied to the whole surface. And we know that because we have the dotted lines on the outside. And so, again, we're only talking about full-surface mark. As soon as you have it defined for poetry, that's a separate thing. Okay, but pattern across the full swath of packaging, that could be considered for inherent distinctiveness. And that is now considered. And this decision does not disturb that fact that it has a big mark on it. That is considered under CBRUX. Even if it's just colors? The pattern comprises colors. Pattern comprises colors, and repeating patterns are specific shapes in a pattern. Okay. If the court has no further questions, I'd ask that you affirm. Thank you. All right, I'm going to give it to the monitor. Oh, just to confirm, you would think if we say this needs to be understood, this needs to be reviewed for inherent distinctiveness, it's the CBRUX factors we would use? Yes. Okay. Okay, thank you. Mr. Cochran? Well, we agree that CBRUX factors are the factors that should be used. And under the CBRUX factors, you look at things like, is this a common type of shape or pattern? Is it common in this particular industry or set of goods that are being sold? And I don't have to go through the CBRUX. Right. The agency is saying that there needs to be a step zero even before we get to the CBRUX factors. And that step zero is, do we even have a pattern mark here? Right. And what they did was they just – they hide behind this term color mark, which means that the mark only has colors in it. It doesn't have anything else. And then they say colors alone cannot be inherently distinctive. And that's because it's rectangular? The outer shape is rectangular? Yeah. They had an objection to, you know, the fact that we put dots around it and it could be rectangular, circular, oval, whatever, you know, fit the backer part of the label. Yes, I had a problem with that. You know, I'll give you an example. What does the dotted line mean? That it can be any shape? Well, any shape of any backer part of the label. It doesn't have to be rectangular. No, not the way we applied for this because we put the dots around the mark that would go on. So it's just packing backer cards that you're applying for? Not just – not any and all kinds of packaging? I ask because the first sentence of your – the description of the mark is the mark consists of the colors red into yellow with a black banner located near the top as applied to packaging for the goods, period. Then it goes on. The dotted lines merely depict placement of the mark on the packing backer card. And so one way to read those two sentences is packing backer card is an example of the packaging you're trying to get protection for and you're trying to get protection for any and all packaging with this color scheme. Or you're applying just for the types of packaging that are known as packing backer cards. Which one is it? The latter. It says the dotted lines merely depict placement of the mark on the packer backing cards. That's what we're applying for. And you have packer backing cards that are various shapes, right? Circles, rectangles. Some are square, some are rectangular. At least one is circular. They have a hundred and fifty products that are sold. They've sold a half a billion dollars worth of product with these types of packing backer cards. Do you know what the reason is for this particular color scheme they came up with? I ask because this is welding equipment we're talking about in large part. And I don't know, maybe this looks like a heat gradient in a way. The issue of functionality was never raised. I'm not asking about functionality. And let me tell you that in welding the flames are blue. I think on that note we're out of time. Thank you. I thank both counsel and cases submitted.